UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**McCARTER & ENGLISH, LLP**
Clement J. Farley, Esq.
Geoffrey E. Lynott, Esq.
Phillip S. Pavlick, Esq.
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
Telephone: (973) 622-4444
Facsimile:  (973) 624-7070
Email: cfarley@mccarter.com
        glynott@mccarter.com
        ppavlick@mccarter.com

*Attorneys for the Chapter 7 Trustee*

| | |
|---|---|
| In Re:<br><br>ZAYAT STABLES, LLC,<br><br>      Debtor. | Chapter 7<br><br>Case No.:  20-20524 (VFP) |
| JEFFREY T. TESTA, solely in his capacity as the Chapter 7 Trustee of ZAYAT STABLES, LLC<br><br>      Plaintiff,<br><br>      vs.<br><br>ORPENDALE UNLIMITED COMPANY,<br><br>      Defendant. | Adv. Pro. No.:  _____ |

## ADVERSARY COMPLAINT

Plaintiff, Jeffrey T. Testa ("Trustee"), solely in his capacity as the duly-appointed Chapter

7 Trustee of Zayat Stables, LLC ("Debtor"), by and through his attorneys, McCarter & English,

LLP, hereby alleges as and for his Adversary Complaint against Defendant, Orpendale Unlimited Company ("Orpendale"), as follows:

## PRELIMINARY STATEMENT

1.      As set forth in greater detail below, the Debtor sold some of its valuable breeding rights in Triple Crown-winner American Pharoah to Orpendale for prices that were well below fair market value, thereby diminishing the Debtor's assets and crippling its ability to generate proceeds to satisfy its creditors.

2.      The Trustee now seeks to avoid these transfers as both actually fraudulent and constructively fraudulent transfers.

## JURISDICTION AND VENUE

3.      The United States Bankruptcy Court for the District of New Jersey ("Bankruptcy Court") has subject-matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b).

4.      The Bankruptcy Court has personal jurisdiction over Defendant pursuant to Rule 7004(f) of the Federal Rules of Bankruptcy Procedure.

5.      This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

6.      Venue is proper in the Bankruptcy Court pursuant to 28 U.S.C. § 1409(a).

7.      The predicates for the relief requested herein are from state law and  §§ 544, 548, and 550 of the Bankruptcy Code and Rule 7001 of the Federal Rules of Bankruptcy Procedure.

## THE PARTIES

8.      On September 14, 2020 ("Petition Date"), an involuntary petition for relief under Chapter 7 of Title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, "Bankruptcy Code"), was filed against the Debtor in the Bankruptcy Court.

ME1 44158357v.1

9.      The Court entered the Order for Relief on October 9, 2020.[1]

10.     On that same day, October 9, 2020, the Office of the United States Trustee for the District of New Jersey appointed Jeffrey T. Testa, Esq., as the interim Chapter 7 Trustee of the Debtor.

11.     The Trustee is the duly-appointed, qualified, and serving Chapter 7 Trustee of the Debtor.

12.     Defendant, Orpendale, is an entity organized under the laws of Ireland and does business in the United States under the trade name Coolmore Stud, with its principal place of business located at Castlehyde Stud, Castlehyde, Fermoy, Co. Cork, P61 TR29, Ireland.

## FACTUAL BACKGROUND

### General Background

13.     The Debtor was a thoroughbred horseracing organization that was formed in 2005.

14.     The Debtor was a Delaware limited-liability company with a principal place of business at 401 Hackensack Avenue, 7th Floor, Hackensack, New Jersey 07601.

15.     At all relevant times, Ahmed Zayat ("Ahmed Zayat" or "Mr. Zayat") was the sole member of the Debtor. Various other family members of Mr. Zayat were also involved in the company.

### The Sale of American Pharoah

16.     The Debtor bred and was the 100% owner of American Pharoah, a thoroughbred racehorse.

17.     In 2015, American Pharoah became the 12th Triple Crown winner and the Breeders' Cup Classic champion.

---

[1] The Defendant agreed to toll the applicable statute of limitations through and including February 10, 2023.

ME1 44158357v.1

18.     On or about January 16, 2015, the Debtor sold 100% of the stallion shares of American Pharaoh pursuant to a purchase agreement ("AP Purchase Agreement") to Orpendale.

19.     The Debtor received over $23 million in proceeds from Orpendale in connection with the AP Purchase Agreement.

20.     Under the terms of AP Purchase Agreement, nine of American Pharaoh's lifetime breeding rights (collectively, "AP Breeding Rights") were assigned between Mr. Zayat's wife and children.

21.     Each of the AP Breeding Rights entitles its holder to breed one thoroughbred mare with American Pharaoh in each breeding season over the course of the horse's life.

**The Transfer of the AP Breeding Rights to the Debtor**

22.     Upon information and belief, in the Spring 2016, Mr. Zayat met with MGG Investment Group LP ("MGG") for the purposes of refinancing the Debtor's existing debt and obtaining additional financing to fund equine acquisitions for the Debtor's benefit.

23.     On July 8, 2016, the Zayat family members transferred their interests in the AP Breeding Rights to the Debtor.

24.     On that same day, Ashford Stud provided confirmation of the transfer of the AP Breeding Rights from the Zayat family members to the Debtor.

25.     The AP Breeding Rights were property of the Debtor.

**The Debtor Sold the AP Breeding Rights to Orpendale for Less Than Fair Market Value and Less Than Reasonably Equivalent Value**

26.     Beginning in March of 2019, some of the Debtor's AP Breeding Rights were transferred to Orpendale as set forth below.

27.     The AP Breeding Rights were assets owned by the Debtor.

28.     There were nine total AP Breeding Rights (each a "Lifetime Breeding Right").

4

29.    On or about March 26, 2019, Lifetime Breeding Right No. 3 in American Pharaoh was sold to Orpendale for $400,000.

30.    On or about March 29, 2019, Lifetime Breeding Right No. 4 in American Pharaoh was sold to Orpendale for $400,000.

31.    On or about April 14, 2019, Lifetime Breeding Right No. 5 in American Pharaoh was sold to Orpendale for $350,000.

32.    On or about April 14, 2019, Lifetime Breeding Right No. 6 in American Pharaoh was sold to Orpendale for $350,000.

33.    On May 1, 2019, Lifetime Breeding Right No. 7 in American Pharaoh was sold to Orpendale for $350,000.

34.    On June 5, 2019, Lifetime Breeding Right No. 8 in American Pharaoh was sold to Orpendale for $350,000.

35.    On June 5, 2019, Lifetime Breeding Right No. 9 in American Pharaoh was sold to Orpendale for $350,000.   (These AP Breeding Rights sales are collectively referred to hereinafter as the "AP Breeding Rights Transfers").

36.    The approximately $2.6 million aggregate purchase price for the sales of the AP Breeding Rights does not reflect the fair market value of the AP Breeding Rights and deviated from industry standard value.

37.    The Debtor's own valuation placed the value of the AP Breeding Rights at $14 million, and an independent appraisal commissioned by the Debtor in or about July 2019 valued the AP Breeding Rights at $12.6 million.

5

38.    Another appraisal figure from February 2019, just a few months before the AP Breeding Rights Transfers, valued each individual AP Breeding Right at $450,000 per Breeding Right.

39.    To conceal the AP Breeding Rights Transfers from creditors, documentation memorializing the AP Breeding Rights Transfers fraudulently identifies certain Zayat family members as the owners of the AP Breeding Rights.

40.    Upon information and belief, Oprendale knew the AP Breeding Rights were assets of the Debtor.

**Mr. Zayat Admits that the Sales of the Debtor's Assets were Deliberately Concealed and that the Debtor was Insolvent**

41.    Mr. Zayat admitted that the sale of the Debtor's assets had been concealed from MGG until MGG had begun inquiring into the status of the Debtor's assets.

42.    On January 12, 2020, Mr. Zayat sent an e-mail to Kevin Griffin of MGG admitting that he had concealed the sale of the Debtor's equine assets:

> It is tough for me to get myself to write this letter.  But I consider myself to be an honorable and straightforward person.
>
> It kills me and tore me apart, not being transparent with you.
>
> * * *
>
> Your word to me, that your word is your bond was like a sword in my heart. Therefore, I did not want while I was half asleep to have a discussions why I did not disclose to you why we had to sell some asse**ts** (in order for us to fund and continue to operate Zayat Stables and continue to function for Zayat Stables until such a time where any of my routes either Piper Jaffray or the CVC or FocalPoint China funding materialize to fix up all these issues, and allowing myself the time to find the capital to get you paid in full.

6

43.    Mr. Zayat further stated that the reason why the Debtor's assets were sold is because the Debtor was insolvent and had been for some time.  For example, Mr. Zayat represented as follows:

> God knows not only I have used every single savings and cash I have in my bank accounts (business and personal) to fund and operate Zayat Stables.  BUT my personal and financial situation of depleting and funding Zayat Stables. I have exhausted my personal bank accounts, my savings.  I am late on my own personal bills, I have borrowed money from not only friends but have even gone to Cash Advance lenders and borrowed money at ridiculous 30-60% interest rate to fund Zayat Stables. . . I haven't even paid my employees for months.  My son goes 4 months without being paid. . . There isn't a person that I know of that would've fought so hard and be honorable to save this company — and working on numerous routes to find this capital.
>
> *  *  *
>
> Even on a personal note, not only I borrowed from friends and predatory lenders (Cash Advance Merchants).  I even took a personal loan against my house from a Rabbi that I helped for years and contributed hundreds of thousands through the years for his organization. He offered to help after I confided in him my issues. That I needed to fund my company to operate to attract an equity investor to help me survive and weather the cash flow crunch and paying my bills/lenders.  I have used every trick in the book to find money / Borrow money.  Just so I can operate Zayat Stables and float it for the last 15 months to allow myself the chance to get a partner that would make my company financially stronger.

44.    In 2018, Mr. Zayat also began seeking loans for the Debtor from his family members.   In a July 2018 email correspondence, for example, with his brother Sherif El Zayat, Ahmed Zayat was pleading with his brother for money to make payments on behalf of the Debtor in order to "survive for this week."

45.    Likewise, in a January 2019 email to his brother, Ahmed Zayat asked for $1.5 million by January 31 and another $1.5 million by March 1, in order for the Debtor to "operate and survive" and to avoid a "lawsuit against [the Debtor] for not paying."

ME1 44158357v.1

**MGG Obtains a Multi-Million-Dollar Judgment against the Debtor**

46.     On January 21, 2020, MGG commenced an action against the Debtor by filing a complaint in the Fayette Circuit Court for the Commonwealth of Kentucky seeking to recover damages for the MGG Loan ("Kentucky Litigation").

47.     On February 11, 2020, MGG filed an amended complaint seeking damages against Mr. Zayat and Justin Zayat to recover additional damages in connection with the MGG Loan, including with respect to the sale of the Debtor's assets that were pledged as collateral for the MGG Loan.

48.     On June 10, 2021, the Kentucky state court entered judgment against the Debtor and in favor of MGG in the amount of $24,534,166.13.

49.     The Events of Default underlying the judgment in the Kentucky Litigation were primarily caused by the Debtor's intentional concealment of its transfers.

50.     In addition to MGG, the Debtor was obligated to multiple other unsecured creditors.

ME1 44158357v.1

## FIRST CAUSE OF ACTION
### Avoidance of Actual Fraudulent Transfers
### Pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550

51.     The Trustee repeats, reiterates, and realleges each and every allegation as set forth in the preceding paragraphs hereof with the same force and effect as if fully set forth herein.

52.     Section 548(a)(1)(A) of the Bankruptcy Code provides that:

(a)(l) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily –

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted . . . .

53.     The AP Breeding Rights Transfers to Orpendale are fraudulent transfers that should be avoided pursuant to § 548(a)(1)(A) of the Bankruptcy Code, and are recoverable pursuant to § 550 of the Bankruptcy Code.

54.     The AP Breeding Rights were the Debtor's property and are therefore, assets of the Debtor's bankruptcy estate.

55.     The AP Breeding Rights Transfers occurred beginning on March 26, 2019, which is within two years before the September 14, 2020 Petition Date.

56.     The Debtor either voluntarily or involuntary made the AP Breeding Rights Transfers with the actual intent to hinder, delay, or defraud its creditors, including but not limited to its largest creditor MGG, whose loan to the Debtor was secured by, among other assets, the AP Breeding Rights.

9

57.     The Debtor's sole member has admitted in emails that he concealed the AP Breeding Rights Transfers from MGG.

58.     Accordingly, the Trustee is entitled to avoid and recover the AP Breeding Rights, or their equivalent value, from Orpendale for the benefit of the Debtor's bankruptcy estate and its creditors.

**SECOND CAUSE OF ACTION**
**Avoidance of Actual Fraudulent Transfers**
**Pursuant to 11 U.S.C. §§ 544(b), 550 and N.J.S.A. 25:2-25(a)(1)**

59.     The Trustee repeats, reiterates, and realleges each and every allegation as set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

60.     Section 544(b)(1) of the Bankruptcy Code provides that a trustee may avoid "any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable." "[A]pplicable law" includes state law.

61.     As of the Petition Date, American Express held an allowable unsecured claim against the Debtor.  American Express later filed its filed proof of claim, which is Claim No. 3-1. The Debtor is obligated to numerous other unsecured creditors.

62.     Pursuant to N.J.S.A. 25:2-25(a):

> A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

> With actual intent to hinder, delay, or defraud any creditor of the debtor . . . .

63.     The AP Breeding Rights Transfers are fraudulent transfers that should be avoided pursuant to New Jersey law and are recoverable pursuant to § 550 of the Bankruptcy Code.

ME1 44158357v.1

64.    The AP Breeding Rights were the Debtor's property and are therefore, assets of the Debtor's bankruptcy estate.

65.    The Debtor made the AP Breeding Rights Transfers with the actual intent to hinder, delay, or defraud its creditors including but not limited to its largest creditor MGG, whose loan to the Debtor was secured by, among other assets, the AP Breeding Rights.

66.    The Debtor's sole member has admitted in emails that he concealed the AP Breeding Rights Transfers from MGG.

67.    Accordingly, the Trustee is entitled to avoid and recover the AP Breeding Rights, or their equivalent value, from Orpendale for the benefit of the Debtor's bankruptcy estate and its creditors.

**THIRD CAUSE OF ACTION**
**Avoidance of Actual Fraudulent Transfers**
**<u>Pursuant to 11 U.S.C. §§ 544(b), 550 and  K.R.S. 378A.040(1)(a)</u>**

68.    The Trustee repeats, reiterates, and realleges each and every allegation as set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

69.    Section 544(b)(1) of the Bankruptcy Code provides that a trustee may avoid "any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable." "[A]pplicable law" includes state law.

70.    As of the Petition Date, American Express held an allowable unsecured claim against the Debtor.  American Express later filed its filed proof of claim, which is Claim No. 3-1. The Debtor is obligated to numerous other unsecured creditors.

71.    Pursuant to <u>K.R.S.</u> 378A.040(1)(a):

> (1) A transfer made or obligation incurred by a debtor is voidable as
>      to a creditor, whether the creditor's claim arose before or after

11

(a) the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

With actual intent to hinder, delay, or defraud any creditor of the debtor . . . .

72.    The AP Breeding Rights Transfers are fraudulent transfers that should be avoided pursuant to Kentucky law and are recoverable pursuant to §550 of the Bankruptcy Code.

73.    The AP Breeding Rights were the Debtor's property and are therefore assets of the Debtor's bankruptcy estate.

74.    The Debtor made the AP Breeding Rights Transfers with the actual intent to hinder, delay, or defraud its creditors including but not limited to its largest creditor MGG, whose loan to the Debtor was secured by, among other assets, the AP Breeding Rights.

75.    The Debtor's sole member has admitted in emails that he concealed the AP Breeding Rights Transfers from MGG.

76.    Accordingly, the Trustee is entitled to avoid and recover the AP Breeding Rights, or their equivalent value, from Orpendale for the benefit of the Debtor's bankruptcy estate and its creditors.

### FOURTH CAUSE OF ACTION
### Avoidance of Constructive Fraudulent Transfers
### Pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550

77.    The Trustee repeats, reiterates, and realleges each and every allegation as set forth in the preceding paragraphs hereof with the same force and effect as if fully set forth herein.

78.    Section 548(a)(1)(B) of the Bankruptcy Code provides that:

(a)(l) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the

12

debtor voluntarily or involuntarily . . . .

(B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in a business or transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

79.    The AP Breeding Rights Transfers are constructively fraudulent transfers that should be avoided pursuant to § 548(a)(1)(B) of the Bankruptcy Code, and are recoverable pursuant to § 550 of the Bankruptcy Code.

80.    The AP Breeding Rights were the Debtor's property and are therefore, assets of the Debtor's bankruptcy estate.

81.    The AP Breeding Rights Transfers occurred beginning on March 26, 2019, which is within two years before the September 14, 2020 Petition Date.

82.    In addition to the self-interested nature of the sales, the approximate $2.6 million aggregate purchase price for the sales of the AP Breeding Rights does not reflect the fair market value of the AP Breeding Rights.

83.    The Debtor's own valuation placed the value of the AP Breeding Rights at $14 million, and an independent appraisal commissioned by the Debtor in or about July 2019 valued the AP Breeding Rights at $12.6 million.

ME1 44158357v.1

84.    Another appraisal figure from February 2019, just a few months before the AP Breeding Rights Transfers, valued each individual AP Breeding Right at $450,000 per Breeding Right.

85.    Accordingly, in exchange for the AP Breeding Rights Transfers the Debtor received less than reasonably equivalent value.

86.    The Debtor's sole member has admitted in emails that he concealed the AP Breeding Rights Transfers from MGG.

87.    The Debtor's sole member also admitted in emails that the Debtor's assets were sold because the Debtor was insolvent and had been for some time.

88.    The Debtor's sole member also admitted in emails that the Debtor could not pay its debts as they became due, leading Mr. Zayat to plead with his brother, among others, for cash infusions.

89.    Therefore, in executing the AP Breeding Rights Transfers, the Debtor was engaged in a business or transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was unreasonably small capital, or the Debtor intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

90.    Accordingly, the Trustee is entitled to avoid and recover the AP Breeding Rights, or their equivalent value, from Orpendale for the benefit of the Debtor's bankruptcy estate and its creditors.

ME1 44158357v.1

## FIFTH CAUSE OF ACTION
### Avoidance of Constructive Fraudulent Transfers
### Pursuant to 11 U.S.C. §§ 544(b), 550 and N.J.S.A. 25:2-25(a)(2)

91.     The Trustee repeats, reiterates, and realleges each and every allegation as set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

92.     Section 544(b)(1) of the Bankruptcy Code provides that a trustee may avoid "any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable." "[A]pplicable law" includes state law.

93.     As of the Petition Date, American Express held an allowable unsecured claim against the Debtor.  American Express later filed its filed proof of claim, which is Claim No. 3-1. The Debtor is obligated to numerous other unsecured creditors.

94.     Pursuant to N.J.S.A. 25:2-25(a)(2):

> a. A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

> (a) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

> (b) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due.

95.     The AP Breeding Rights Transfers are constructive fraudulent transfers that should be avoided pursuant to New Jersey law and are recoverable pursuant to § 550 of the Bankruptcy Code.

ME1 44158357v.1

96.     In addition to the self-interested nature of the sales, the approximately $2.6 million aggregate purchase price for the sales of the AP Breeding Rights does not reflect the fair market value of the AP Breeding Rights.

97.     The Debtor's own valuation placed the value of the AP Breeding Rights at $14 million, and an independent appraisal commissioned by the Debtor in or about July 2019 valued the AP Breeding Rights at $12.6 million.

98.     Another appraisal figure from February 2019, just a few months before the AP Breeding Rights Transfers, valued each individual AP Breeding Right at $450,000 per Breeding Right.

99.     Accordingly, in exchange for the AP Breeding Rights Transfers the Debtor received less than reasonably equivalent value.

100.    The Debtor's sole member has admitted in emails that he concealed the AP Breeding Rights Transfers from MGG.

101.    The Debtor's sole member also admitted in emails that the Debtor's assets were sold because the Debtor was insolvent and had been for some time.

102.    The Debtor's sole member also admitted in emails that the Debtor could not pay its debts as they became due, leading Mr. Zayat to plead with his brother for cash infusions.

103.    Therefore, in executing the AP Breeding Rights Transfers, the Debtor was engaged in a business or transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was unreasonably small capital, or the Debtor intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

ME1 44158357v.1

104.    Accordingly, the Trustee is entitled to avoid and recover the AP Breeding Rights,
or their equivalent value, from Orpendale for the benefit of the Debtor's bankruptcy estate and its
creditors.

**SIXTH CAUSE OF ACTION**
**Avoidance of Constructive Fraudulent Transfers**
**Pursuant to 11 U.S.C. §§ 544(b), 550 and K.R.S. 378A.040(1)(b)**

105.    The Trustee repeats, reiterates, and realleges each and every allegation as set forth
in the preceding paragraphs with the same force and effect as if fully set forth herein.

106.    Section 544(b)(1) of the Bankruptcy Code provides that a trustee may avoid "any
transfer of an interest of the debtor in property or any obligation incurred by the debtor that is
voidable under applicable law by a creditor holding an unsecured claim that is allowable."
"[A]pplicable law" includes state law.

107.    As of the Petition Date, American Express held an allowable unsecured claim
against the Debtor.  American Express later filed its filed proof of claim, which is Claim No. 3-1.
The Debtor is obligated to numerous other unsecured creditors.

108.    Pursuant to K.R.S. 378A.040(1)(b):

> (1) A transfer made or obligation incurred by a debtor is voidable as
> to a creditor, whether the creditor's claim arose before or after the
> transfer was made or the obligation was incurred, if the debtor made
> the transfer or incurred the obligation:
>
> (b) Without receiving a reasonably equivalent value in exchange for
> the transfer or obligation, and the debtor:
>
> 1. Was engaged or was about to engage in a business or a transaction
> for which the remaining assets of the debtor were unreasonably
> small in relation to the business or transaction; or
>
> 2. Intended to incur, or believed or reasonably should have believed
> that the debtor would incur, debts beyond the debtor's ability to pay
> as they become due.

17

109.    The AP Breeding Rights Transfers are constructive fraudulent transfers that should be avoided pursuant to Kentucky law and are recoverable pursuant to § 550 of the Bankruptcy Code.

110.    In addition to the self-interested nature of the sales, the approximately $2.6 million aggregate purchase price for the sales of the AP Breeding Rights does not reflect the fair market value of the AP Breeding Rights.

111.    The Debtor's own valuation placed the value of the AP Breeding Rights at $14 million, and an independent appraisal commissioned by the Debtor in or about July 2019 valued the AP Breeding Rights at $12.6 million.

112.    Another appraisal figure from February 2019, just a few months before the AP Breeding Rights Transfers, valued each individual AP Breeding Right at $450,000 per Breeding Right.

113.    Accordingly, in exchange for the AP Breeding Rights Transfers the Debtor received less than reasonably equivalent value.

114.    The Debtor's sole member has admitted in emails that he concealed the AP Breeding Rights Transfers from MGG.

115.    The Debtor's sole member also admitted in emails that the Debtor's assets were sold because the Debtor was insolvent and had been for some time.

116.    The Debtor's sole member also admitted in emails that the Debtor could not pay its debts as they became due, leading Mr. Zayat to plead with his brother for cash infusions.

117.    Therefore, in executing the AP Breeding Rights Transfers, the Debtor was engaged in a business or transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was unreasonably small capital, or the Debtor intended to incur,

18

or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as

such debts matured.

118.   Accordingly, the Trustee is entitled to avoid and recover the AP Breeding Rights,

or their equivalent value, from Orpendale for the benefit of the Debtor's bankruptcy estate and its

creditors.

**SEVENTH CAUSE OF ACTION**
**Avoidance of Constructive Fraudulent Transfers**
**Pursuant to 11 U.S.C. §§ 544(b), 550 and N.J.S.A. 25:2-27(a)**

119.   The Trustee repeats, reiterates, and realleges each and every allegation as set forth

in the preceding paragraphs with the same force and effect as if fully set forth herein.

120.   Section 544(b)(1) of the Bankruptcy Code provides that a trustee may avoid "any

transfer of an interest of the debtor in property or any obligation incurred by the debtor that is

voidable under applicable law by a creditor holding an unsecured claim that is allowable."

"[A]pplicable law" includes state law.

121.   As of the Petition Date, American Express held an allowable unsecured claim

against the Debtor.  American Express later filed its filed proof of claim, which is Claim No. 3-1.

The Debtor is obligated to numerous other unsecured creditors.

122.   Under N.J.S.A. 25:2-27(a):

> A transfer made or obligation incurred by a debtor is fraudulent as
> to a creditor whose claim arose before the transfer was made or the
> obligation was incurred if the debtor made the transfer or incurred
> the obligation without receiving a reasonably equivalent value in
> exchange for the transfer or obligation and the debtor was insolvent
> at that time or the debtor became insolvent as a result of the transfer
> or obligation.

19

123.    Before any of the AP Breeding Rights Transfers occurred, the Debtor had already

pledged its assets to MGG as collateral for the loan from MGG.  Thus, MGG's claim arose before

the AP Breeding Rights Transfers were made.

124.    In addition to the self-interested nature of the sales, the approximately $2.6 million

aggregate purchase price for the sales of the AP Breeding Rights does not reflect the fair market

value of the AP Breeding Rights.

125.    The Debtor's own valuation placed the value of the AP Breeding Rights at $14

million, and an independent appraisal commissioned by the Debtor in or about July 2019 valued

the AP Breeding Rights at $12.6 million.

126.    Another appraisal figure from February 2019, just a few months before the AP

Breeding Rights Transfers, valued each individual AP Breeding Right at $450,000 per Breeding

Right.

127.    Therefore, in exchange for the AP Breeding Rights Transfers the Debtor received

less than reasonably equivalent value.

128.    Accordingly, the Trustee is entitled to avoid and recover the AP Breeding Rights,

or their equivalent value, from Orpendale for the benefit of the Debtor's bankruptcy estate and its

creditors.

## EIGHTH CAUSE OF ACTION
### Avoidance of Constructive Fraudulent Transfers
### Pursuant to 11 U.S.C. §§ 544(b), 550 and K.R.S. 378A.050(1)

129.    The Trustee repeats, reiterates, and realleges each and every allegation as set forth

in the preceding paragraphs with the same force and effect as if fully set forth herein.

130.    Section 544(b)(1) of the Bankruptcy Code provides that a trustee may avoid "any

transfer of an interest of the debtor in property or any obligation incurred by the debtor that is

20

voidable under applicable law by a creditor holding an unsecured claim that is allowable." "[A]pplicable law" includes state law.

131.    As of the Petition Date, American Express held an allowable unsecured claim against the Debtor.  American Express later filed its filed proof of claim, which is Claim No. 3-1. The Debtor is obligated to numerous other unsecured creditors.

132.    Under K.R.S. 378A.050(1):

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

133.    Before any of the AP Breeding Rights Transfers occurred, the Debtor had already pledged its assets to MGG as collateral for the loan from MGG.  Thus, MGG's claim arose before the AP Breeding Rights Transfers were made.

134.    In addition to the self-interested nature of the sales, the approximately $2.6 million aggregate purchase price for the sales of the AP Breeding Rights does not reflect the fair market value of the AP Breeding Rights.

135.    The Debtor's own valuation placed the value of the AP Breeding Rights at $14 million, and an independent appraisal commissioned by the Debtor in or about July 2019 valued the AP Breeding Rights at $12.6 million.

136.    Another appraisal figure from February 2019, just a few months before the AP Breeding Rights Transfers, valued each individual AP Breeding Right at $450,000 per Breeding Right.

ME1 44158357v.1

137.     Therefore, in exchange for the AP Breeding Rights Transfers the Debtor received less than reasonably equivalent value.

138.     Accordingly, the Trustee is entitled to avoid and recover the AP Breeding Rights, or their equivalent value, from Orpendale for the benefit of the Debtor's bankruptcy estate and its creditors.

**NINTH CAUSE OF ACTION**
**Unjust Enrichment**

139.     The Trustee repeats, reiterates, and realleges each and every allegation as set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

140.     By the wrongful acts and omissions specifically set forth herein, Orpendale was unjustly enriched at the expense of and to the detriment of the Debtor.

141.     Orpendale was unjustly enriched without justification as a result of receiving the AP Breeding Rights—the Debtor's property—and obtaining pecuniary benefits in connection therewith.

142.     The Debtor has been damaged by Orpednale's unjust enrichment.

143.     The Trustee, as a representative of the Debtor, seeks restitution from Orpendale.

**WHEREFORE**, for the foregoing reasons, the Trustee respectfully requests entry of a Judgment against the Defendant as follows:

A.     On the First through Eighth Causes of Action, as against Orpendale for the transfers of AP Breeding Rights Nos. 3-9;

B.     On the Ninth Cause of Action, as against Orpendale for unjust enrichment;

C.     Awarding the Trustee his attorney's fees, costs and other expenses incurred in this action; and

22

ME1 44158357v.1

    D.      On each Cause of Action, granting the Trustee such other and further relief as the

Court may deem appropriate and just.

Dated: February 10, 2023

**MCCARTER & ENGLISH, LLP**
*Attorneys for Chapter 7 Trustee*

By: */s/ Clement J. Farley*
    Clement J. Farley, Esq.
    Geoffrey E. Lynott, Esq.
    Phillip S. Pavlick, Esq.
    Four Gateway Center
    100 Mulberry Street
    Newark, NJ 07102
    Telephone: (973) 622-4444
    Facsimile:  (973) 624-7070
    Email: cfarley@mccarter.com
           glynott@mccarter.com
           ppavlick@mccarter.com

ME1 44158357v.1